IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GREGORY HUNTER and HUNTER      )
FAMILY CAPITAL, LLC,           )
                               )
            Plaintiffs,        )
                               )
      v.                       )      1:15cv1050
                               )
MOUNTAIN COMMERCE BANK and     )
BOBBY A. BROWN,                )
                               )
            Defendants.        )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This lawsuit arises out of a lending relationship related to the construction of commercial properties in Tennessee. Before the court is the motion of Defendants Mountain Commerce Bank ("MCB") and Bobby A. Brown to dismiss the complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) or for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3). (Doc. 5.) Defendants move in the alternative to transfer this action to the United States District Court for the Eastern District of Tennessee pursuant to 28 U.S.C. § 1404. (Id.) For the reasons set forth below, the motions will be denied.

## I. BACKGROUND

Viewed in the light most favorable to Plaintiffs Gregory Hunter and Hunter Family Capital, LLC ("HFC"), the complaint and

supporting affidavits[1] show the following.

Hunter is a citizen and resident of Forsyth County, North Carolina. (Doc. 2, ¶ 2.) He and his wife own HFC, a North Carolina limited liability company, which owns fifty percent of Kingsley Investment Group ("Kingsley"), a Tennessee limited liability company. (Id. ¶¶ 1, 5.) Robert Feathers, a Tennessee resident, co-owns Kingsley with HFC. (Doc. 5-1, ¶ 5; Doc. 5-2, ¶ 5.) Neither Kingsley nor Feathers is a party to this action. During the period in question, Hunter held himself out as Kingsley's CEO and "performed the majority of Kingsley's executive management duties." (Doc. 8, ¶ 7.) Hunter "maintained [his] office for Kingsley in Winston-Salem, North Carolina." (Id.)

MCB is a bank organized under the laws of Tennessee, with its principal place of business in Unicoi County, Tennessee, which abuts the North Carolina border just above the city of Asheville. (Doc. 2, ¶ 7.) Brown, a citizen and resident of Washington County, Tennessee, is MCB's senior vice president and maintains his office in Johnson City, Tennessee. (Doc. 5-2, ¶¶ 2-3.)

This dispute arises from an agreement among the parties for MCB to finance the construction of three restaurants in the Tri-

---

[1] The court properly considers supporting affidavits in determining whether a plaintiff has made a prima facie showing of personal jurisdiction. Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014).

Cities area of Tennessee. The loan was to be supported in part by a guaranty from the Small Business Association ("SBA"). The parties agreed that MCB would complete the application for an SBA guaranty. Hunter and HFC's complaint centers on their claim that on several occasions, MCB misrepresented its expertise and the state of its SBA application.

<u>The Original Loan</u>

In 2013, Kingsley planned to build three franchise restaurants in Johnston City, Kingsport, and Bristol, Tennessee. (Doc. 2, ¶¶ 10, 11; Doc. 8, ¶¶ 8-10.) Acting as Kingsley's CEO, Hunter asked MCB for a financing proposal for constructing and furnishing the restaurants. (Doc. 5, ¶ 6; Doc. 8, ¶¶ 7, 10-11.) In March of 2014, Brown responded with a "Summary of Loan Commitment Letter" that provided for a $2 million loan to finance the restaurant construction and furnishings. (Doc. 5-2, ¶ 12; Doc. 8, ¶ 13; Doc. 2-1, ¶ 2.) The loan was to be collateralized by "[a] UCC" on the restaurants' business assets and supported by an SBA guaranty. (Doc. 2-1, ¶ 3.) MCB represented that it had expertise in securing SBA guaranties and agreed to complete the application with the SBA. (Doc. 2, ¶¶ 15, 18, 21.)

Plaintiffs allege that during the following seventeen months, MCB repeatedly misrepresented the state of its application for an SBA guaranty. In fact, during that period, MCB submitted at least

3

three separate applications for SBA guaranties.  The first one was "essentially blank" (Doc. 2, ¶ 42), and the second — submitted nine months after the first application and three months after Kingsley threatened litigation against MCB (Doc. 5-2, ¶ 16; Doc. 2, ¶¶ 86-87) — expired due to inactivity (Doc. 2, ¶ 90).  The SBA approved the third application — submitted in June of 2015 —  and agreed to give MCB a guaranty on the restaurants. (Doc. 2, ¶ 96.) In September of 2015, MCB asked Kingsley to close the original loan.  (Id. ¶ 98.)  Kevin Horne (who had replaced Brown as Kingsley's primary contact at MCB), an MCB lawyer, Kingsley's members, and Kingsley's lawyer met at MCB's office in Johnson City, Tennessee.  (Id. ¶ 99.)  At this meeting, MCB indicated that it was not prepared to close the loan but asked Kingsley to sign a release of claims against MCB.  (Id. ¶ 100.)  Kingsley declined MCB's new terms (id. ¶ 102), and the loan was never closed.

Stop-Gap Loans

Between March of 2014 (when MCB delivered the Commitment Letter) and September of 2015, MCB's delays in securing the SBA guaranty to support the original loan required Hunter to take out three successive personal loans with MCB as stop-gaps to finance the restaurants' construction and furnishings.

The first two "bridge loans" were closed on April 18, 2014, and August 13, 2014.  Hunter and Feathers signed both loans, and

4

each loan was for $500,000. (Doc. 8, ¶¶ 15, 19; <u>see also</u> Doc. 2-2, ¶ 2; Doc. 2-3; Doc. 2-4; Doc. 2-5, ¶ 2.) The April loan closing took place in Tennessee, and the August loan was signed by email. (<u>See</u> Doc. 5-2, ¶ 9; Doc. 8-2.) Both bridge loans provide for Tennessee law to govern (Doc. 2-3, at 3; Doc. 2-4, at 3), and they were collateralized by commercial property Feathers owned in Kingsport, Tennessee (Doc. 2, ¶ 65; Doc. 2-2, ¶ 3; Doc. 2-5, ¶ 3). Hunter signed extensions of the bridge loans in December of 2014, March of 2015, June of 2015, and August of 2015. (Doc. 8, ¶ 46.) He signed these extensions in North Carolina. The record does not indicate whether or where Feathers signed them. (<u>Id.</u>)

On October 14, 2014, MCB issued Hunter a third personal loan, this one for $200,000. (Doc. 8-6.) As collateral, MCB took a security interest in the accounts receivable of Hunter's North Carolina-based financial advisory business and in all proceeds from Hunter's retirement payments. (Doc. 8-6 at 5, ¶ 1; Doc. 8, ¶ 28.) Hunter claims that to meet MCB's collateral requirement, he was forced to retire and to accelerate selling his book of business as a financial adviser. (Doc. 8, ¶ 27.) The agreement also required Hunter to maintain life insurance policies assigned to MCB on himself and his business partner, Tanner Robinson, who would continue to service the book of business to generate the retirement revenues. (Doc. 8, ¶¶ 35, 39; Doc. 8-7.) Robinson is

5

a North Carolina resident.  (Doc. 8, ¶ 39.)  Hunter also asserts that during this time, MCB "demanded" a mortgage on his North Carolina home.  (Doc. 8, ¶ 48.)  MCB hired a North Carolina attorney to prepare that mortgage.  This mortgage was not mentioned in the written security agreement (id.), and the record is not clear whether the mortgage was ever executed.  Hunter made payments on this loan by depositing his retirement proceeds in his North Carolina bank account and then mailing checks to MCB to be drawn against that account.  (Doc. 8, ¶ 42; Doc. 8-8.)

This security agreement twice specifies Tennessee law as controlling.  (Doc. 8-6, at 4, 9.)  The security agreement also provides that "[i]f property described in this agreement is located in another state, this agreement may also, in some circumstances, be governed by the law of the state in which the Property is located."  (Id. at 3.)

Misrepresentations Regarding the SBA Applications

Plaintiffs allege that MCB misrepresented the state of its application for an SBA guaranty on several occasions and that Plaintiffs relied on them in agreeing to stop-gap financing.

On March 31, 2014, after Brown sent Hunter the Commitment Letter, Hunter and Brown met in Tennessee to discuss the loan. (Doc. 2, ¶ 21.)  At the meeting, Brown characterized the SBA application as a "routine matter."  At some point, presumably in

6

close proximity to that meeting, Brown told Hunter that MCB was an "expert" at obtaining SBA guaranties. He also referred to the SBA approval process as a "mere formality." (Id., ¶¶ 15, 18, 21.)

On April 8, 2014, Hunter asked Brown how the SBA guaranty application was proceeding. Brown responded to Hunter by email and assured him that "[i]ts [sic] going ok." (Id., ¶ 30.) Ten days later, on April 18, 2014, Hunter and MCB closed on the first bridge loan. (Doc. 2-3.)

On or about May 30, 2014, Brown submitted the first application for an SBA guaranty. (Doc. 2, ¶ 42.) This was the first SBA application Brown submitted. (Id.) The SBA requested numerous missing components and eventually rejected the application, which was "essentially blank." (Id.) Brown did not tell Plaintiffs the SBA had rejected the application. Further, Brown did not submit another application until almost a year later, in March of 2015.

On June 20, 2014, Hunter requested an update on the original loan. (Id. ¶ 47.) Later that day, Brown responded to Hunter by email and told him he would have a commitment within the next week. He did not. (Id.) In the same email, Brown claimed that his delay on the SBA guaranty application was "mainly [his] getting accustomed to everything the SBA requires and in what format."

(Id., ¶ 48.)  Brown did not disclose that the SBA had already rejected MCB's first application.  (Id.)

On August 6, 2014, after Hunter asked for another update on the loan, Brown attributed the delay to his need to transfer certain electronic information to the SBA's paper form.  (Id., ¶ 54.)  In reality, the SBA application was incomplete because Brown had not submitted it in the format the SBA required.  (Id.) On August 8, 2014, Brown again told Hunter the closing would take place "soon."  (Id., ¶ 55.)

Late in the summer of 2014, Hunter asked MCB about additional financing for a fourth restaurant.  (Id., ¶¶ 73-74.)  Brown responded to Hunter and declined to offer financing because he did not want to "upset the process with the SBA" and wanted to wrap up the original loan.  (Id. ¶ 74.)  This led Hunter to believe that Brown was "diligently working in good faith the [sic] close the Restaurant Loan."  (Id.)

On August 13, 2014, the parties closed on the second bridge loan.  On October 14, 2014, they closed on the third loan.  After Hunter signed the third loan, Brown continued to conceal that he had failed to comply with the SBA's requests regarding the application and that the SBA had rejected the first application. (Id., ¶ 81.)

8

On October 14, 2014, the parties closed on the third bridge loan. In March of 2015, after MCB's second application for the SBA guaranty was withdrawn because of inactivity (Id., ¶ 90), Horne and an MCB lawyer told Kingsley that the SBA documentation was complete, that MCB hoped to hear back from the SBA soon, and that a closing on the SBA loan was "imminent." (Id., ¶¶ 91, 94.)

MCB submitted its third application for an SBA guaranty in June of 2015, and the SBA accepted it. (Id., ¶ 96.) The parties met in September of 2015 to close the original loan, but MCB advised it was not prepared to do so and insisted on releases for its delays. MCB refused and, consequently, the loan was never closed. (Id. ¶¶ 100–113.)

Procedural History

On November 12, 2015, Hunter and HFC filed the present action in North Carolina Superior Court in Forsyth County. Their complaint contains eleven counts against MCB and Brown in connection with MCB's delays in completing the original loan and making of the stop-gap loans and required security. Plaintiffs allege that MCB's false assurances fraudulently kept the Kingsley from seeking alternative financing, required it to incur significant delay costs, and caused Plaintiffs to incur additional personal liabilities and losses. Against MCB, Plaintiffs allege breach of contract, breach of the implied covenant of good faith

9

and fair dealing, breach of implied contract, promissory estoppel, equitable estoppel, and rescission. Against MCB and Brown, Plaintiffs allege negligent misrepresentation, fraud, promissory fraud, violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104, and violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

On December 10, 2015, MCB and Brown removed the action to this court pursuant to 28 U.S.C. § 1441. Defendants now move to dismiss the action for lack of personal jurisdiction or for improper venue, or, in the alternative, to transfer pursuant to 28 U.S.C. § 1404. (Doc. 5.) The parties have briefed the motions and submitted supporting affidavits. The motions are ready for consideration.

## II. ANALYSIS

### A. Standard of Review

In the absence of an evidentiary hearing, a plaintiff bears the burden of making a prima facie showing of personal jurisdiction. Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014) (citing Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 276 (4th Cir. 2009)). "In considering whether the plaintiff has met this burden, the district court 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the

10

most favorable inferences for the existence of jurisdiction.'" Id. (quoting Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). Once a plaintiff makes a prima facie demonstration of personal jurisdiction, the court can proceed "as if it has personal jurisdiction over th[e] matter, although factual determinations to the contrary may be made at trial." Pinpoint IT Servs., L.L.C. v. Atlas IT Export Corp., 812 F. Supp. 2d 710, 717 (E.D. Va. 2011) (citing 2 James Wm. Moore et al., Moore's Federal Practice ¶ 12.31 (3d ed. 2011)). A plaintiff must prove personal jurisdiction by a preponderance of the evidence. Combs, 886 F.2d at 676. A threshold prima facie showing does not settle the issue; a plaintiff "must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing." New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294 n.5 (4th Cir. 2005) (quoting Prod. Grp. Int'l v. Goldman, 337 F. Supp. 2d 788, 793 n.2 (E.D. Va. 2004)).

**B.  Personal Jurisdiction**

For this court to exercise personal jurisdiction, North Carolina's long-arm statute must confer a basis for the assertion of personal jurisdiction and the exercise of personal jurisdiction must comply with the Due Process Clause of the Fourteenth Amendment. Universal Leather, 773 F.3d at 558 (citing ESAB Grp.,

11

Inc. v. Zurich Ins. PLC, 685 F.3d 376, 391 (4th Cir. 2012)); Pan-Am. Prods. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 677 (M.D.N.C. 2011).

### 1. Long-arm Statute

Plaintiffs assert that this court has jurisdiction under N.C. Gen. Stat. § 1-75.4(1)(d).[2] This provision confers jurisdiction over defendants that are "engaged in substantial activity" in North Carolina. The North Carolina Supreme Court has held that § 1-75.4(1)(d) "permits the exercise of personal jurisdiction over a defendant to the outer limits allowable under federal due process." Universal Leather, 773 F.3d at 558 (citing Dillon v. Numismatic Funding Corp., 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977)). Thus, under § 1-75.4(1)(d), the sole question is whether the Plaintiffs have made a prima facie showing that Defendants "had sufficient contacts with North Carolina to satisfy constitutional due process." Universal Leather, 773 F.3d at 558-59.[3]

---

[2] Plaintiffs also assert that this court has jurisdiction under §§ 1-75.4(4)(a), (5)(c), and (5)(d). Because the court has jurisdiction under subsection (1)(d), it need not reach these alternative bases. Further, all of § 1-75.4's provisions are "to be liberally construed in favor of finding jurisdiction." Carson v. Brodin, 160 N.C. App. 366, 369, 585 S.E.2d 491, 494 (2003) (citing Starco, Inc. v. AMG Bonding & Ins. Servs., 124 N.C. App. 332, 338, 477 S.E.2d 211, 216 (1996)).

[3] Recently, North Carolina courts have engaged in more thorough analyses under § 1-75.4, emphasizing that "the two-step [personal-jurisdiction] process is, in fact, a two-step process." IHFC Props., LLC v. APA Mktg., Inc., 850 F. Supp. 2d 604, 616 (M.D.N.C. 2012) (citing Brown v. Ellis,

### 2. Due Process and the Effects Test

Two types of personal jurisdiction are consistent with the Due Process Clause: specific and general jurisdiction. See Goodyear Dunlop Tires Operations, S.A., v. Brown, 564 U.S. 915, 919 (2011); Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn.8-9 (1984); Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 188 (4th Cir. 2016). Specific jurisdiction is "based on conduct connected to the suit," Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 301 (4th Cir. 2012) (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711 (4th Cir. 2002)), whereas general jurisdiction "requires a more demanding showing of 'continuous and systematic' activities within the forum state," id. (quoting ALS, 293 F.3d at 712). Plaintiffs argue that specific jurisdiction applies here.

"For a court to have specific personal jurisdiction over a defendant, the defendant must have 'purposefully established minimum contacts in the forum State' such that the defendant 'should reasonably anticipate being haled into court there.'" Perdue, 814 F.3d at 189 (quoting Burger King Corp. v. Rudzewicz,

---

363 N.C. 360, 363, 678 S.E.2d 222, 223 (2009) (per curiam)); see also Speedway Motorsports Int'l Ltd. v. Bronwen Energy Trading, Ltd., 209 N.C. App. 474, 487–91, 707 S.E.2d 385, 393–96 (2011); Willis v. Willis, No. COA14-1090, 2015 WL 4429653, at *2-3 (N.C. Ct. App. July 21, 2015). Here, the parties contest personal jurisdiction only on due process grounds.

471 U.S. 462, 474 (1985)). This aims to "ensure that the defendant is not 'haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts.'" <u>Consulting Eng'rs</u>, 561 F.3d at 277 (quoting <u>Burger King</u>, 471 U.S. at 475).

Specific jurisdiction depends in part on the kind of claims asserted. <u>See</u> <u>Felland v. Clifton</u>, 682 F.3d 665, 674 (7th Cir. 2012). For contract claims, the question is "whether, in connection with th[e] contract, [the defendant] had a substantial connection with [the forum state] such that it 'engaged in some activity purposefully directed toward [the forum].'" <u>Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners</u>, 229 F.3d 448, 451 (4th Cir. 2000) (quoting <u>ESAB Grp., Inc. v. Centricut, Inc.</u>, 126 F.3d 617, 625 (4th Cir. 1997)). For intentional-tort claims, the court applies the <u>Calder</u> effects test. <u>IMO Indus., Inc. v. Kiekert AG</u>, 155 F.3d 254, 260 (3d Cir. 1998); <u>see</u> <u>Calder v. Jones</u>, 465 U.S. 783, 789-90 (1984).

Here, for the reasons that follow, the court concludes it has independent, specific jurisdiction over Defendants with respect to Plaintiffs' intentional-tort claims.

### a. Plaintiffs' Tort Claims

"The [<u>Calder</u>] effects test does not supplant the minimum contacts analysis, but rather informs it." <u>Consulting Eng'rs</u>, 561 F.3d at 280. The effects test applies in circumstances where "an

out-of-state defendant has acted outside of the forum in a manner that injures someone residing in the forum." Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 397 (4th Cir. 2003). The test requires that the plaintiff allege that (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity. Consulting Eng'rs, 561 F.3d at 280 (quoting Carefirst, 334 F.3d at 398 n.7); see also, e.g., ESAB, 126 F.3d at 626-27 (assuming without deciding that in this procedural posture, it is enough to allege — as opposed to show — an intentional tort).

Here, Plaintiffs' allegation of intentional torts supplies sufficient contacts with North Carolina to establish jurisdiction in the forum.

The first part of the Calder test requires a plaintiff to allege an intentional tort. Plaintiffs allege fraud and promissory fraud against both Defendants in their complaint. (Doc. 2, ¶¶ 158-74.) Fraud is an intentional tort. See Sain v. Adams Auto Grp., Inc., 781 S.E.2d 655, 662 (N.C. Ct. App. 2016).

Second, a plaintiff must have felt the brunt of the harm caused by the alleged fraud in the forum state. Plaintiffs allege

they were injured financially in North Carolina. (Doc. 8, ¶ 52; Doc. 2, ¶ 165.) Among other injuries, Hunter claims to have partially liquidated his IRA, tapped his home equity line, liquidated other personal savings, and sold his North Carolina-based book of business due to reliance on MCB's misrepresentations about the SBA application. (Doc. 8, ¶ 52.) Cf. Hanson & Morgan Livestock, Inc. v. B4 Cattle Co., Inc., No. 5:07-cv-00330, 2008 WL 4066251, at *5 (S.D.W. Va. Aug. 27, 2008) ("Plaintiff, a West Virginia corporation, was injured financially in West Virginia and therefore felt the brunt of the harm in West Virginia."). Therefore, North Carolina was the focal point of Plaintiffs' injuries.

The third part of the Calder test requires the Defendants to have expressly aimed their tortious activity at North Carolina. See CoStar Grp., Inc. v. LoopNet, Inc., 106 F. Supp. 2d 780, 785 (D. Md. 2000) ("[T]he plaintiff must . . . point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." (quoting IMO, 155 F.3d at 265-66)). Simple knowledge that a plaintiff might be harmed in the forum is insufficient to establish an express aim. See Centricut, 126 F.3d at 625. "[A]lthough the place the plaintiff feels the alleged injury is plainly relevant to the [jurisdictional] inquiry, it must ultimately be accompanied by the defendant's own

16

contacts with the state if jurisdiction over the defendant is to be upheld." Id. at 626; see Felland, 682 F.3d at 675 (finding that communications intended to deceive plaintiffs sent into the forum state constituted "ongoing misrepresentations . . . 'expressly aimed'" at the forum state).

Here, Plaintiffs sufficiently allege that Defendants reached into North Carolina through their tortious conduct. Plaintiffs contend that Defendants made the following misrepresentations by phone and email to Hunter while Hunter was in North Carolina for the purpose of inducing continued actions with MCB (Doc. 8, ¶ 51):

- On or around March 28, 2014, Brown represented that the SBA application was a mere formality and that he had met with the SBA and "they seemed okay with the structure." (Doc. 2, ¶ 18.) In reality, Brown had merely attended a "generalized regional training session given by the SBA" and had not met with the office of the SBA that underwrites SBA guaranties. (Id. ¶ 19.)

- On April 8, 2014, Hunter represented that the SBA guaranty process was "going ok," when in fact Brown had yet to submit an application to the SBA. (Id. ¶¶ 30, 42.)

- On June 20, 2014, Brown represented that Hunter would have a commitment within a week and blamed the "extended delay" on his "getting accustomed to everything the SBA requires and in what format." (Id. ¶ 48.) The commitment was not so provided and, in reality, the SBA had already rejected Brown's application. (Id. ¶¶ 42, 48-49.)

- On August 6, 2016, Brown said the delay in SBA approval was due to his need to transfer certain electronic information to the SBA's paper form.

17

(Id. ¶ 54.) Brown did not reveal that the SBA application had been rejected due to his failure to "submit[] the SBA application in the correct electronic format required by SBA." (Id.)

- On or about August 8, 2014, Brown again represented that closing would occur "soon." (Id. ¶ 55.)

- On September 4 and 5, 2014, Brown declined Hunter's request for additional funding on the ground that he did not want to "upset the process with the SBA" and wanted to focus on wrapping up the restaurant loan per the initial loan commitment. (Id. ¶ 74.) In reality, at that time, Brown's SBA application had been rejected, and he had not submitted a new application. (Id. ¶ 81.)

Hunter, a North Carolina resident, took on hundreds of thousands of dollars in personal debt through three personal loans in reliance on these communications. Moreover, MCB required the third loan to be secured by life insurance policies on two North Carolina residents and by Hunter's North Carolina-based accounts receivable. The security agreement for the loan recognized that North Carolina law may control that collateral. Further, while the parties agreed that Tennessee law would govern the bridge loans, Hunter signed extensions on those loans in North Carolina, creating a continuing relationship with MCB that will extend into late 2017. Thus, Defendants directed the allegedly tortious conduct into North Carolina.

This situation differs from cases in which courts have found themselves lacking jurisdiction over defendants vis-à-vis

18

intentional-tort claims.

In Centricut, a South Carolina plaintiff alleged that Florida and New Hampshire defendants conspired to misappropriate trade secrets. 126 F.3d at 625. The South Carolina plaintiff filed suit in South Carolina, and the Fourth Circuit found that

> [a]ll relations among [the Florida and New Hampshire parties] were carried out in and between New Hampshire and Florida. The only South Carolina 'contact' related to this suit is that [the alleged conspirators] knew that the sales leads . . . might, if fruitful, ultimately result in less sales to the [plaintiff].

Id. This contact, though intentional, was insufficient to establish personal jurisdiction. In contrast, Defendants in the present case reached into North Carolina by pursuing a long-term relationship backed by North Carolina securities.

In Flanders Corp. v. EMI Filtration Products LLC, the court found that tortious conduct was not aimed at North Carolina when Idaho residents induced other non-North Carolina residents not to perform obligations under loan documents that were "negotiated, administered, and enforced" in North Carolina. No. 4:13-CV-00189-BR, 2014 WL 524673, at *3 (E.D.N.C. Feb. 7, 2014). Similarly, in JTH Tax, Inc. v. Liberty Services Title, Inc., a Virginia court found no personal jurisdiction when a Virginia company's Florida franchisees were the targets of the alleged tort. 543 F. Supp. 2d 504, 508 (E.D. Va. 2008). Here, the tortious conduct was directed

19

at North Carolina citizens and entities and related to North Carolina security interests.

As a result, Defendants should have anticipated that their conduct could result in being haled into court in North Carolina, see World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1908), and this court's exercise of jurisdiction over them "does not offend traditional notions of fair play and substantial justice," Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement, 326 U.S. 310, 316 (1945).

Finding all three prongs of the Calder effects test satisfied, the court may exercise personal jurisdiction over Plaintiffs' intentional-tort claims within the bounds of due process.

### b. Pendent Personal Jurisdiction

The question arises – unaddressed by the parties – whether this court has pendent personal jurisdiction over Defendants with regard to Plaintiff's remaining claims. Courts may assert "pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction, so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." N.C. Mut. Life Ins. Co. v. McKinley Fin. Serv., Inc., 386 F. Supp. 2d 648, 656 (M.D.N.C. 2005) (citing Action Embroidery Corp. v. Atl. Embroidery, Inc., 368 F.3d 1174, 1180

20

(9th Cir. 2004)); see also 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1069.7 (4th ed.) (providing an overview of pendent personal jurisdiction and explaining that pendent personal jurisdiction can exist in the context of diversity jurisdiction).

In this case, Plaintiffs' claims arise from a common nucleus of operative fact in that they all relate to Defendants' allegedly fraudulent actions and failure to follow through on the SBA application. Cf. McKinley, 386 F. Supp. 2d at 656–57 (finding personal jurisdiction over a tortious-interference claim and exercising pendent personal jurisdiction over two additional claims that arose from the tortfeasor's actions); see also id. at 655 (explaining that a corporate officer who commits a tort "is subject to personal jurisdiction in the state where the tort was committed"). Therefore, having found personal jurisdiction over the alleged intentional torts, this court may exercise personal jurisdiction over the remaining claims arising out of those common facts.

### C.   Venue

Defendants argue in the alternative that venue is improper in this district. "The standard for deciding a motion to dismiss for lack of personal jurisdiction is the same as that for a motion to dismiss for a lack of venue. The burden is on the plaintiff to

21

establish jurisdiction and venue in the judicial district where the action is brought." IFHC Props., LLC v. APA Mktg., Inc., 850 F. Supp. 2d 604, 615 (M.D.N.C. 2012) (citations omitted). At this procedural stage, "the court must draw all inferences in favor of the plaintiff." Godfredson v. JBC Legal Grp., P.C., 387 F. Supp. 2d 543, 547 (E.D.N.C. 2005).

Where a case is removed to a federal district court, the removal statute, 28 U.S.C. § 1441, determines the proper venue. Godfredson, 387 F. Supp. 2d at 547 (citing Polizzi v. Cowles Magazines, Inc., 345 U.S. 663, 665 (1953)). Under § 1441, "numerous courts have held that a Rule 12(b)(3) motion to dismiss based on improper venue is unavailable where a case has been removed to the federal district embracing the state district where the action was pending." IHFC, 850 F. Supp. 2d at 613-14 (collecting cases); see also Hollis v. Fla. State Univ., 259 F.3d 1295, 1299 (11th Cir. 2001) ("[A]s a matter of law, § 1441(a) establishes federal venue in the district where the state action was pending, and it is immaterial that venue was improper under state law when the action was originally filed.").

The present action was removed from Forsyth County Superior Court to the United States District Court for the Middle District of North Carolina. Thus, venue is proper and Defendants' motion to dismiss on this ground is denied.

22

## D.    Motion to Transfer

Defendants argue in the alternative that this action should be transferred to the United States District Court for the Eastern District of Tennessee, Greenville Division, pursuant to 28 U.S.C. § 1404(a).  Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  Plaintiffs do not dispute that this case could have been brought in the United States District Court for the Eastern District of Tennessee.

In considering a § 1404(a) motion to transfer, the court weighs the following discretionary factors:

> (1) the plaintiff's initial choice of forum; (2)
> relative ease of access to sources of proof; (3)
> availability of compulsory process for attendance of
> unwilling witnesses, and the cost of obtaining
> attendance of willing and unwilling witnesses; (4)
> possibility of a view of the premises, if appropriate;
> (5) enforceability of a judgment, if one is obtained;
> (6) relative advantage and obstacles to a fair trial;
> (7) other practical problems that make a trial easy,
> expeditious, and inexpensive; (8) administrative
> difficulties of court congestion; (9) local interest in
> having localized controversies settled at home; (10)
> appropriateness in having a trial of a diversity case in
> a forum that is at home with the state law that must
> govern the action; and (11) avoidance of unnecessary
> problems with conflicts of laws.

Dillon v. BMO Harris Bank, N.A., 16 F. Supp. 3d 605, 617 (M.D.N.C.

23

2014) (citation omitted); see also Plant Genetic Sys. N.V. v. Ciba Seeds, 933 F. Supp. 519, 527 (M.D.N.C. 1996). "The moving party bears the burden of establishing that transfer to another venue is proper." IFHC, 850 F. Supp. 2d at 622 (citations omitted). Because Defendants fail to carry their burden, their motion to transfer will be denied.

### 1. Plaintiffs' Choice of Forum

A "plaintiff's choice of forum is often the most important factor in a transfer of venue analysis." Triad Int'l Maint. Corp. v. Aim Aviation, Inc., 473 F. Supp. 2d 666, 669 (M.D.N.C. 2006). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Collins v. Straight, Inc., 748 F.2d 916, 921 (4th Cir. 1984) (quoting Gulf Oil v. Gilbert, 330 U.S. 501, 508 (1946)). Courts give more weight to a plaintiff's choice of forum when the plaintiff has a close connection with the forum. Compare Triad, 473 F. Supp. 2d at 669-70 (giving weight to the plaintiff's choice of forum when the plaintiff maintained offices in North Carolina, ordered materials from North Carolina, and maintained documents in North Carolina), with Speed Trac Techs., Inc. v. Estes Express Lines, Inc., 567 F. Supp. 2d 799, 803 (M.D.N.C. 2008) (giving the plaintiff's choice of forum "diminished weight" because the plaintiff maintained its office in another district and the "key operative

24

facts" occurred outside the district).

In the present case, Plaintiffs chose North Carolina as the forum for this action, and their choice should be afforded weight. The injuries they allege were felt in Forsyth County, which is in this district. Hunter also maintains his Kingsley office in Forsyth County, and he executed the MCB contracts at his office. (Doc. 8, ¶ 7.)

### 2. Ease of Access to Sources of Proof

Defendants argue that their documents are located in Tennessee and that all witnesses, with the exception of Plaintiffs themselves, are located in Tennessee. (Doc. 6, at 13-14.) Feathers, Horne, and Brown are located in Tennessee, but other potential witnesses — namely, Virginia Hunter, Tim Moore, and Tanner Robinson — are based in North Carolina. (Doc. 7, at 19.) MCB's documents are in Tennessee, and Hunter maintains his and Kingsley's documents in North Carolina. Cf. Speed Trac, 567 F. Supp. 2d at 803 ("[The] court should refrain from transferring venue if to do so would simply shift the inconvenience from one party to another." (quoting Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc., 841 F. Supp. 719, 721 (M.D.N.C. 1993))). As such, this factor is neutral in the analysis.

### 3. Local Interest

Citing Speed Trac, Defendants argue that "the only

25

relationship [to the operative events] is in Tennessee." (Doc. 6, at 13 (emphasis in original).) However, in Speed Trac, "the location of the Plaintiff's principal office," the location of "virtually all evidence," and the residence of "all identified North Carolina witnesses" was in the alternate venue. 567 F. Supp. 2d at 804. Here, these factors are neutral.

Further, the Supreme Court has recognized that a state "generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." Burger King, 471 U.S. at 473 (citation omitted). Where, as here, the in-state plaintiff has allegedly suffered an intentional tort by the out-of-state defendant, this is particularly pertinent. Therefore, North Carolina's interest in this case weighs against transfer.

### 4. Availability of Compulsory Process

Defendants assert that if Feathers is an unwilling witness, he would "only be subject to compulsory process for attendance if the case is in Tennessee." (Doc. 6, at 13.) However, "[t]o carry its burden, 'the moving party must demonstrate whether [its] witness[es] [are] willing to travel to a foreign jurisdiction.'" IFHC, 850 F. Supp. 2d at 623 (quoting Samsung Elecs. Co., Ltd. v. Rambus, Inc., 386 F. Supp. 2d 708, 719 (E.D. Va. 2005) (internal quotation marks and citation omitted)). As Plaintiffs correctly

26

note, Defendants have made no showing that any Tennessee witnesses would be unwilling to appear. Additionally, neither the Eastern District of Tennessee nor this court "will be able to exercise compulsory process over all of the witnesses in this case." IFHC, 850 F. Supp. 2d at 624. Therefore, this factor neither supports nor weighs against transfer.

### 5. State Law Governing the Action

Defendants argue that "the parties contractually agreed in certain documents that Tennessee law would control." (Doc. 6, at 13.) Plaintiffs respond that "[t]his Court can decide plaintiffs' claims that are based on Tennessee law." (Doc. 7, at 20.) Because this court sits in diversity, it "must apply the substantive law of the forum state including its choice of law rules." Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007) (per curiam) (citing Klaxon Co. v. Stentor Elect. Mfg. Co., 313 U.S. 487, 496-97 (1941)). North Carolina generally recognizes contractual choice-of-law clauses. See, e.g., Volvo Const. Equip. North Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 600-01 (4th Cir. 2004).

A choice-of-law clause alone, however, is insufficient to justify a transfer of venue, especially where, as here, Plaintiffs have also alleged a claim governed by North Carolina law. See Rice v. Bellsouth Advert. & Pub. Corp, 240 F. Supp. 2d 526, 531

27

(W.D.N.C. 2002) (noting that tort claims under N.C. Gen. Stat. § 75-1.1 favor denying a motion to transfer, even when a related contract contained a choice-of-law clause electing another state's law); see also Synovus Bank v. Sciupider, No. 1:13-CV-00092-MR-DLH, 2014 WL 4406900, at *3 (W.D.N.C. Sept. 8, 2014) (explaining that a choice-of-law clause in a promissory note "does not dictate that South Carolina law is applicable to every dispute between the parties"). Therefore, while the choice-of-law provisions may weigh in favor of Defendants' motion, this is insufficient to overcome the presumption in favor of Plaintiffs' choice of forum.[4]

Ultimately, the remaining factors are either not relevant or do not favor Defendants, and the factors on which Defendants rely to support transfer of venue are insufficient to overcome Plaintiffs' choice of forum. Therefore, the court finds that it would not be in the interest of justice to transfer this action to the Eastern District of Tennessee, and Defendants' motion will be denied.

## III. CONCLUSION

For the reasons stated,

---

[4] Cf. Triad, 473 F. Supp. 2d at 672 ("Whichever law is applied to any of the claims, it does not appear that the case is one that is complex or involves novel issues of law so that either this Court or the [proposed venue] would have difficulty deciding the case. For this reason, the Court finds that the factor does not weigh either for or against transfer.").

IT IS THEREFORE ORDERED that Defendants' motions to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3), and to transfer pursuant to 28 U.S.C. § 1404(a) (Doc. 5) are DENIED.

/s/    Thomas D. Schroeder
United States District Judge

September 28, 2016